ESTATE OF FRANK H. NELSON, DECEASED, SCOTT ROMINE and MARY L. ROMINE, CO-EXECUTORS, Pettioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Nelson v. Commissioner
Docket No. 8786-78.
United States Tax Court
T.C. Memo 1980-518; 1980 Tax Ct. Memo LEXIS 67; 41 T.C.M. (CCH) 400; T.C.M. (RIA) 80518; November 24, 1980, Filed *67 Harvin H. Gesell, for the petitioners. Roberta P. Cona and Michael J. Cooper, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal estate tax of the Estate of Frank H. Nelson, Decedent, Scott Romine and Mary L. Romine, Co-Executors, in the amount of $16,832.47. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision only the fair market value on September 27, 1975, of 160 acres of Illinois farmland owned by decedent at the date of his death. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Scott Romine and his wife, Mary Lou Romine, Co-Executors of the Estate of Frank H. Nelson, resided in Downs, Illinois, at the time of filing the petition in this case. A timely estate tax return (Form 706) was filed on behalf of the Estate of Frank H. Nelson with the Internal Revenue Service Center, Kansas City, Missouri. Frank H. Nelson, decedent, resided in Bloomington, Illinois, until his death on September 27, 1975. On the date of his death, decedent owned a 160-acre tract of farmland located *68 in McLean County, Illinois. In his last will and testament, probated in the Circuit Court of McLean County, Illinois, decedent devised the 160-acre farm to his wife, Lena L. Nelson, and his two daughters, Wilma J. Goetsch and Mary Lou Romine. Decedent's wife and daughters each inherited an undivided one-third interest in the farmland. In preparation for the filing of the estate tax return, the executors obtained an appraisal on the 160-acre farm from Dean Yoder and Associates. A copy of this report, which concluded that as of September 27, 1975, the fair market value of the 160-acre farm was $198,400, was attached to the estate tax return. On September 16, 1976, Wilma J. Goetsch and her husband, Raymond Goetsch, sold their undivided one-third interest in the subject farmland to Raymond S. Romine and Mary Lou Romine. The purchase price of the undivided one-third interest in the farmland was $80,000 payable pursuant to the following terms: Eight Thousand Dollars ($8,000.00) upon the execution of this agreement, receipt of which is hereby acknowledged and Four Thousand Eight Hundred Dollars ($4,800.00) plus interest at the rate of 8% per annum on the unpaid balance on the *69 1st day of November, 1977 and on the 1st day of November of each and every year thereafter until the full amount of principal and interest at the rate of 8% per annum shall have been paid in full. Privilege is given to Buyer to pay any additional amount at anytime after January 1, 1977 without penalty for prepayment. Any prepayments shall be first credited to interest accrued to the date of payment, if any, and the balance applied to the reduction of the principal sum. Interest shall commence October 1, 1976. Buyer shall receive the 1976 crop presently growing on said land and shall reimburse Seller for any of the cost of production charged to or expended by Seller for said crop year and for any expenses that Seller has been charged with or paid for maintenance and any other expenses of said property that accrued to Seller by reason of her 1/3 interest in said property since the death of her father, Frank Nelson. Buyer shall pay 1976 taxes and taxes for all subsequent years. The subject property is L-shaped. The south 40 acres is pastureland and the balance is tillable soil of varying qualities. The higher quality soil is on the west side. The soil in this *70 area is prairie soil. A part of the soil is a dark brown silt loam of good depth, productivity, and durability, and the remaining soil is a light brown silt loam with moderate productivity and durability. Some of the soil in this area has suffered from erosion, reducing its productivity. Included in the tillable acreage are grass waterways and grass buffer poles which control erosion and are not therefore actually planted in crops. The farm takes some water from adjoining property, and there are certain drainage ways on the farm. There is a ditch that enters east of the southwest corner of the 40 acres kept in pastureland and timber. It crosses the tract, leaving it near the northeast corner of the pastureland. Since this 40 acres has been kept in pastureland, no serious erosion has occurred in the area. The western part of the land is gently rolling to rolling, but the slope throughout the entire area of the farm is approximately 40 feet as shown by a geological map published by the U.S. Department of the Interior. The farm contains an old two-story frame house that has been remodeled. The house has a full basement with a forced air, oil burning furnace. In addition to the *71 house, the farm is improved by an old ear corn crib with overhead bins, a pole-frame barn, a Quonset-type hut implement shed, and two poultry houses. The county tax records show the farm contains 160 acres. The assessed value of the 160 acres is $50,120, and the real estate tax paid in 1977 was $2,397.68 or $14.99 per acre. The farm is located on a county blacktop road between 6 and 7 miles southeast of Bloomington, which is the county seat of McLean County. It is approximately 3 miles from Downs, a small county. There have been a number of sales of property between 1969 and 1976 in the general area of the subject property. During this period of time there had been a steady increase in the value of property in the area of the subject farm. Although most of the land surrounding the subject property was still farmland on September 27, 1975, the date of decedent's death, residential subdivisions had started developing in some of the surrounding areas. Most of these subdivisions were in rolling land to the south and southeast of the subject property. Since the date of decedent's death, the area has been actively developing into subdivision property. The following schedule sets *72 forth sales of certain property used in the report of petitioners' expert witness showing the sale number, the size of the property, the date of the sales, the price per acre, and the adjusted sales price determined by petitioners' expert to account for increases in values to September 27, 1975: Adjusted
Sale
Price
Sales Price
No.
Area
Date of Sale
Sales Price
Per Acre
Per Acre
1
80
Dec. 29, 1969
$ 40,000
$ 500
$1,075
2
148
Mar. 29, 1969
76,664
518
1,100
3
182
Nov. 1, 1974
259,350
1,425
1,675
Properties No. 1 and 3 were improved properties. Property No. 1 is located adjacent to the east end of the subject property. Property No. 2 is an unimproved farm. All three of the properties were sold at auction. [1]
*73 The following schedule shows the sales by number, the size in acres, the date of the sales, the sales price, the price per acre, the time adjustment made, and the adjusted sales price of five pieces of property listed in the report of respondent's expert witness: Sale
Price
Time
Adjusted
No.
Area
Date of Sale
Sales Price
Per Acre
Adjustment
Sales Price
1
48
Nov. 20, 1976
$108,000
$2,500
-$620
$1,620
2
251
Feb. 10, 1975
453,000
1,800
+200
2,000
3
40
Sep. 10, 1973
60,000
1,500
+600
2,100
4
104
Feb. 23, 1974
110,500
1,062
+318
1,380
5
82.54
Oct. 6, 1975
98,500
1,193
0
1,193
The property represented in Sale No. 5 is immediately adjacent to the south part of the subject property. The land included in the properties which were the subjects of Sales Nos. 1, 2 and 3 listed above were more comparable to the better part of the subject property than to its less fertile soil. On Schedule A of the estate tax return of Frank H. Nelson, petitioners reported that the 160-acre farm as improved with its buildings had a value at the date of decedent's death of $198,400 based on the appraisal report of *74 Dean Yoder and Associates. From that amount petitioners deducted $1,662.81 as the estimated 1975 real estate taxes due on the subject property. Therefore, on the recapitulation form of the return petitioners reported $196,737.19 as the value of decedent's real estate owned at his death. In his statutory notice of deficiency respondent determined that the fair market value, as of the date of decedent's death, of decedent's 160-acre farm is "$264,000 in lieu of a valuation of $198,400 reported in the estate tax return." OPINION The only issue for our decision is the fair market value of a 160-acre tract of farmland owned by decedent on the date of his death. The parties agree that the applicable valuation date is September 27, 1975, the date of death of decedent. Although petitioners possessed an appraisal report prepared by Dean Yoder and Associates, dated November 6, 1975, which placed a fair market value of $198,400 on the property as of September 27, 1975, in preparation for trial petitioners hired Lee Long to render a second valuation opinion. Mr. Long testified at the trial on behalf of petitioners. In making his calculation Mr. Long did not consult the Yoder report. *75 Instead, on December 30, 1977, Mr. Long entered onto and inspected the subject property. In his opinion the property had serious topography problems. In his view, certain of the areas of the farms were gently rolling, others suffered minor erosion and other portions of the property included "broad strips of severely eroded surfaces." In his appraisal report Mr. Long described the various soil types found on the 160-acre farm and stated his opinion of the general productivity levels that could be expected from each of these soil types. Additionally he referred to productivity problems attributable to water drainage onto the subject property from neighboring farmlands. Mr. Long expressed the view that because of the existence of a ditch running from the southwest corner to the northeast corner of the south 40 acres which was in pastureland it would be impractical to use this property for residential development. Mr. Long based his appraisal upon the market valuation approach. He considered the highest and best use of the property as agricultural, and he therefore compared the subject property to other farmlands in the vicinity. Mr. Long chose three farms of varying acreage, all *76 of which were sold at auctions. Two of these sales occurred during 1969, and one farm was sold in 1974. When comparing these three sales to the subject property, Mr. Long made adjustments for the fact that in his opinion they had superior topography. Utilizing the table in the U.S. Department of Agriculture booklet, "Farm Real Estate Market Developments," for farms in Illinois, Mr. Long also adjusted the sales price information to account for the lapse of time between the actual sales of the properties he used as comparables and the September 27, 1975, valuation date. Based upon numerous factors, including location, farming practices, soil fertility, history of crop rotations, drainage, improvements, sales of comparable farmland, and neighborhood qualifications, Mr. Long concluded that the fair market value of the land and improvements of the subject property as of September 27, 1975, was $203,100 for an average of $1,269.38 per acre. This conclusion was calculated as follows: 22.00 acres, undulating to gently rolling,
tillable land at $1800 per acre
$ 39,600.00
25.00 acres, gently rolling to strongly
gently rolling, tillable
land at 1525 per acre
38,125.00
40.00 acres, strongly gently rolling to
rolling tillable land at 1450 per acre
58,000.00
25.00 acres, eroded, rolling, tillable
land at 825 per acre
20,625.00
34.00 acres, pasture and lots at 1375 per acre
46,750.00
9.15 acres, in grass waterways and grass plots-no value
1.25 acres, in ditch no value
3.60 acres, in road no value
160.00 acres
$203,100.00
which is $1269.38 per acre.
*77 Respondent offered as an expert witness Herbert F. Voigts. In late January 1977 Mr. Voigts appraised the property as of the September 27, 1975, valuation date. In his appraisal he utilized the market valuation approach and stated that-- the highest and best use for the property is for agricultural usage, specifically cash grain for the north 120 acres and pasture for the south 40 acres. This area also is transition to rural residential, and has this potential. Mr. Voigts had inspected the property on January 21, 1977, and he found that the subject property contained soils with both low and high productivity potential, some acreage with good surface drainage capacity as well as other acreage needing artificial drainage, and well maintained buildings. In estimating the value of the subject property, Mr. Voigts selected five properties which he considered to be comparable. These five farmlands were sold during the period of September 1973 through November 1976, and they ranged in size and price per acre. The smallest of the properties used consisted of 40 acres of land, while the largest included 251 acres. These properties sold for prices ranging between $1,062 per acre and *78 $2,250 per acre. While Mr. Voigts did not consider it necessary to adjust each comparable for location, based upon his experience and government figures he adjusted four of the sales for time. Mr. Voigts concluded that the fair market value of the 160-acre farm on September 27, 1975, was $264,000, or approximately $1,650 per acre. In supporting this valuation, Mr. Voigts stated in his appraisal report that-- An allocation of this entire value of $264,000.00 could be made as follows: 120 acres of tillable, improved land at $1,800.00
per acre
$216,000.00
40 acres of vacant pastureland (residential
potential) at $1,200.00 per acre
$ 48,000.00
This allocation is not necessary, but it is felt that this is the way that a prudent purchaser would look at the property. Although each of the appraisers was aware of the September 16, 1976, sale of the undivided one-third interest of the subject farmland, each rejected this sale as not indicative of the subject property's fair market value. Each appraiser considered the transaction as one occurring at other than arm's length since the sale took place between the decedent's two daughters. Respondent argues that Mr. *79 Long's appraisal is unreliable for a number of reasons. Respondent points out that the adjustment made by petitioners' expert to all the sales prices he used were based solely on his predetermined opinion that the subject property had a value of $1,269 an acre. [2] Respondent contends that in effect petitioners' expert decided on a price per acre that he wanted to use in valuing the subject property and that he adjusted the sales used as comparables to meet this predetermined figure. Respondent further contends that there is no basis for the use by petitioners' expert of a zero value for grass waterways and grass plots, roadways and the ditch. Respondent points out that the farms used as comparable sales also had grass waterways, roadways and ditches, but the price per acre was arrived at by dividing the total price by the total acreage. Respondent further points out that the grass waterways actually have a value since they protect the farm from erosion and that the roadways and ditch serve a useful purpose. *80 Respondent further points out that two of the three sales used by Mr. Long as comparables occurred approximately 6 years prior to the date of decedent's death and that the adjustment made was based on government statistics covering the State of Illinois, which statistics are not necessarily representative of the immediate area of the subject property. Respondent and his expert witness take the position that sales of comparables should occur within 2 to 3 years of the appraisal date and that 6 years exceeds a time frame which can be feasibly adjusted for changes in market values. In our view sales of properties occurring approximately 6 years prior to the valuation date of a property may have some probative value if properly adjusted for price changes. Mr. Long's utilization of the U.S. Department of Agriculture figures for the State of Illinois as set forth in the "Farm Real Estate Market Developments" publication is an acceptable general indication of increases in values of properties in the state in which the subject property is located. However, as Mr. Long himself recognized, the increase in prices of farms in various sections of Illinois varied, and the publication is not *81 necessarily accurately indicative of the changes in the area of the subject farm. This is particularly true since the subject property was in an area of development potential. An inaccuracy in the price variations between the area of the subject property and the State of Illinois used in the publication becomes more pronounced when the adjustment is being made for a period as long as 6 years. Respondent further argues that Mr. Long erred in selecting auction sales to use as comparables. If an auction sale is a forced sale, the realized price might not properly reflect the fair market price a willing buyer would pay a willing seller. While Mr. Long was not explicit as to the nature of the auction sales, he did refer to having valued one of the properties before the auction, giving some indication that the sale was not forced. In any event, respondent's expert agreed that the 1974 sale used by Mr. Long was a sale of property comparable to the subject property. Petitioners contend that Mr. Voigts appraised the subject property without viewing the property in its entirety. They point out that Mr. Voigts went to the subject farm on January 21, 1977, when it was covered by snow, *82 and he viewed the property only from perspectives allowed by standing on the barn lot and by driving along the road on the western border of the property. Petitioners contend that because Mr. Voigts did not inspect thoroughly the subject farm, Mr. Voigts failed to give proper consideration to certain negative aspects of the subject property. Petitioners' expert witness pointed out certain aspects of each of the sales used by Mr. Voigts as comparable to the subject farmland which caused Mr. Long to consider the sale not to be comparable. As to two of the properties, petitioners' expert was of the opinion that the improvements were far more valuable in relationship to the acreage of the farm than were the improvements on the subject property. As to other sales used by Mr. Voigts as comparables, petitioners' expert was of the opinion that all but a small amount of the land of the subject property is generally inferior to the overall quality of the land of Mr. Voigts' selected comparables. Yet, Mr. Long stated that the quality of the land in the property sold on October 6, 1975, which was used by Mr. Voigts as a comparable, is inferior to all the land on the subject property, even the *83 south 40 acres of the subject property to which it was adjacent. However, he contended that this 1975 sale was not of property actually comparable to the subject property because that property was usable as development property. While Mr. Voigts' initial inspection of the property may have been hampered by the snow, he reinspected the property in detail at a later date when no snow was on the ground and did not change his opinion as to its value. Mr. Voigts also used a topographical map of the property in making his valuation. He was generally familiar with the property, having valued a number of other properties in the area of the subject property. Mr. Voigts was of the opinion that the south 40 acres of the subject property could be easily developed merely by putting a large pipe through the ditch and under a roadway on the property or by building a small culvert. He was of the opinion that because of the trees growing on the subject property the south 40 acres of the subject property was more desirable for development than the property sold on October 6, 1975. Considering the record as a whole, in our view the method used by petitioners' expet in valuing the property *84 acre by acre with no value given to certain acreage and no specific value assigned to the improvements has not been shown to arrive at the fair market value of the property. In fact, petitions' expert made no precise showing of how he arrived at some of the prices that he applied to the various parts of the farm. However, in our view respondent's expert gave too much weight to sales of land which are superior to most of the land contained in the subject property. In our view the two sales shown in this record which are most indicative of the value of the subject property are the November 1, 1974, sale of 182 acres at $1,425 per acre used as the third sale by petitioners' expert and the October 6, 1975, sale of 82.54 acres at $1,193 per acre used as a fifth comparable by respondent's expert. The November 1, 1974, sale, when updated to $1,675 an acre for a September 27, 1975, comparison, gives fair indication of the value of a substantial portion of the tillable part of the subject farm. The October 6, 1975, sale is indicative of the value of the 40 acres of pastureland on the subject property. We recognize that petitioners' expert pointed out that the topography of the land sold *85 on November 1, 1974, was superior to that of the subject property and that the building values of the land sold on November 1, 1974, were greater than the building values on the subject property. However, in the opinion of both experts some of the land on the subject property would carry a per acre price greater than the $1,675 per acre updated price of the land sold on November 1, 1974. We are also aware that petitioners' expert valued only 25 acres of the subject property at less than the $1,193 per acre realized on the October 6, 1975, sale of land adjacent to the southern part of the subject property. In the opinion of respondent's expert the land sold in the October 6, 1975, sale was comparable only to the south 40 acres of the subject property. Since there are some grass waterway property, road property, and ditch property on most if not all of the properties used by each of the experts as comparables, in our view we must determine a price per acre to apply to the entire 160 acres of the subject property. We have therefore concluded that if we average the $1,675 an acre, which represents the per acre price of the land sold on November 1, 1974, as adjusted for the September 27, 1975, valuation *86 date, which property is somewhat superior to some of the land on the subject property, and the $1,193 price of the land sold on Ocrober 6, 1975, which is inferior to all except about 40 acres of the subject property, we will arrive at a fair per acre price for the entire 160 acres of the subject property. In reaching this conclusion we have considered in detail the testimony of each expert with respect to the various types of soil contained in the subject property and the buildings located on the subject property. We note that their views differed in some respects as to the type of land which might be comparable to the various types of land on the subject property. Upon consideration of the experts' diverse views in this respect in conjunction with the balance of their testimony, we can determine a reasonable fair market value on a per acre basis for the subject property by averaging the prices of the two parcels most nearly comparable to certain of the land on the subject property. This average value is $1,434 per acre ($1,675 + $1,193./. by 2). When the $1,434 per acre is multiplied by the 160 acres, the result is $229,440, which we have rounded to $229,000. Therefore, on the *87 basis of the evidence as a whole we conclude that on September 27, 1975, the date of decedent's death, the fair market value of decedent's 160 acres of farmland with its improvements was $229,000. Decision will be entered under Rule 155. Footnotes
1. Petitioner's expert witness increased the updated price of Property No. 1 by $200 per acre and of Property No. 2 by $175 per acre merely with the statement that he considered the subject farm had about that amount "per acre greater value on September 27, 1975." He decreased the updated price of Property No. 3 by $400 per acre, stating that Property No. 3 had better topography than the subject farm and that the building's value was greater, and in his opinion $400 per acre represented the greater value of Property No. 3 than the subject farm.↩
2. In this respect petitioners' expert testified: A As I said, I already had decided that the value of the subject farm would be in the vicinity of the $1,269.00 that I used. And I had already updated the value of the Layten farm to where I had it, and so it seemed to me reasonable to say that the difference is in this area of $200.00 per acre. Q Did you use similar reasoning in regard to the other two comparable sales? A I would think that's a correct answer.↩